Case number 09-0727, Bill Atherton v. Connecticut General Life Insurance. Good morning, Your Honors. My name is Michael Rasek. I'm here on behalf of the Plaintiffs' Appellants, the Atherton family. This is the case in which the Athertons filed suit against Quality Care down in Pulaski County to determine whether care was medically necessary for Brooke, their daughter. That case proceeded to a bench trial and a declaratory order relief. They then filed this case up here in Cook County against Intricor and the other defendants, alleging that the nurses and doctors who did the medical reviews and made suggestions to Quality Care, which is the insurance company, were fraudulent in their actions, basically, that they acted improperly and without a medical foundation. The case was pursued up here until it was ready for trial, essentially, not essentially, actually. And then the defendants here filed a motion for summary judgment, basically, on the grounds of race judicata. They also challenged two other elements. As to the race judicata arguments, I would like to, the three elements in race judicata, of course, are the final judgment, that's not an issue, same transaction, and that the parties are the same party or in privity with each other. And I would like to address that privity aspect first because I think it's the most clear error in the circuit court's decision. The party, the single party down in Pulaski County, was the insurance company. The parties here are the nurses and doctors who made the decision and their employer. In order for the parties here to be in privity with quality care in the other case, the criminal case especially suggests what has to happen. The parties here, the defendants here, have to be the virtual representative of quality care. They are not the virtual representative of quality care. If they were the virtual representative of quality care, they would have the same legal interests and more importantly, they would be affected, the parties here would be affected, by the judgment in Pulaski County in the same fashion as quality care was affected by the judgment there. And that cannot be the case. The judgment in Pulaski County was that quality care had to provide a certain number of hours of care to Brooke Atherton. That's not the relief that's sought here. That decision in Pulaski County had no effect on Nurse York and no effect on Dr. Ober. They don't provide the care. They weren't paid for providing care. It has nothing whatsoever to do with them. If it doesn't have anything to do with them, they're not in privity with them. That's the definition of privity. The defendants in this case really only have two cases that they cited in opposition to our privity of party arguments. And one of the reasons I went to this argument first was because their cases are not on point. They have a Bagnolo case, which is the first one, and in that case, the plaintiff didn't challenge the argument. The plaintiff agreed that they were in privity. In the second case that they relied upon, the Illinois Attorney General's Office against Progressive, the case had been tried once before. The question was whether or not certain assets were charitable assets and should have stayed with the Nation of Islam. That was lost. And then the Attorney General came to court and said the same thing. We believe those assets are charitable assets and are the property of the people who donated them, essentially. It was exactly the same issue. The issue that was decided in the first case precluded a different decision in the second case. Here, the decision in the first case does not preclude or in any way affect the decision in this case. What is the relationship of York and Ober to quality care as it concerns the treatment that was not afforded to Brook Ashton? They give advice to quality care in terms of reports of what we believe the number of hours that are medically necessary is the key to them. The final decision, they've all made that clear in their depositions that were taken in this case, the final decision as to the amount of care to be given is made by quality care, called QCHIP in the record in a lot of places. So obviously they're providing, and I don't have any problem with it, and that goes to the transactional argument. I mean, are these people feeding into the transaction? If they're stepping back, that's why I wanted to parse out the privity argument, because whether they're in privity with them tends to get mixed in with whether it's the same transaction. Those are two separate points. Isn't it true that defendants had an agency relationship with quality care? Yes, they were. Quality care hired these people to do the job, but they weren't partners. They were agents, and the agency was such that these people had input into quality care, and then quality care had the right to make the final decision and the controlling interest. Does that make them privity? As a matter of fact, it argues against privity because of the reason I said, that the judgment against quality care is for more hours. It doesn't affect these people. When you say these people, can you be more specific? I'm sorry. Because the contract was with – yes, I'd just like you to be more specific. I'm sorry. I think there's levels of relationships. It is. We have quality care, which is the party downstate, and the defendants here are Intracorp and its medical director, Dr. Ober, and its administrative nurse, I'll call her, medical review person, Nurse York, and they are affiliated in some way with Cigna. So we have a group of people on this side whose job solely is to look at – they don't look at the medical records completely. They look at medical reviews. They look at the medical records and then make a recommendation to quality care as to whether or not hours are medically necessary. And quality care, these witnesses, meaning York and Ober and Dr. Linda Post, who also works for Intracorp. So York and Ober were hired by Intracorp. Well, York and Ober are employees of Intracorp. Correct. That's correct. As was Dr. Post, whose testimony is also in the record and whose conduct is that issue. And Intracorp is – one of the witnesses described Intracorp as an affiliate in some way of Cigna, Connecticut General. They're all tied together somehow. But none of them is the insurer, and that was my point. The insurer is quality care. They pay the money. Actually, they pay the money on behalf of the state of Illinois, but quality care pays the money. The people that we've sued up here, Cigna and Intracorp and York and Ober, do not pay any money to anybody. They do not provide medical care to anybody. All they do is give advice, and we've alleged that their advice was fraudulent. So as a result, their interests can't be affected by what comes down the road. Not directly. And if their interests aren't affected, then they're not in privity with quality care. And the underlying evidence of this, if I needed an extra card to play, if the court may recall that the contract between quality care here and all these entities over here who are all advisors or consultants  says that if one group is sued, either quality care or Cigna, Intracorp, York, and Ober, and we realize it should have been the other group, we will step forward and substitute. They recognized in that language, I would argue, that they're not the same, that they really are different. If they were the same, they wouldn't have this need for one to agree to substitute for the other in case some plaintiff made a mistake. They don't have to be the same. They just have to be connected with their interests. They have to have their interests adequately. It has to exist between the parties, privilege for their interests to be adequately representative of the same legal interests. They don't have to be the same. They don't have to be identical, but they do need to have the same interests, and that's my point. They don't have the same interests. If they had the same interests, and that's what Permal said, Permal said the non-party must be affected by the judgment as if he was a party. If these people, and by these people I mean Cigna, Intracorp, and York, and Ober, were parties down in Pulaski County, they would not be affected by the judgment that was entered down there. Do you have any other arguments? Your time is almost up. As to the transactional argument then, the question there becomes is this the same transaction? Transactions obviously can be a broad term or a narrow term. It's still an equitable term, and I think the bottom line there, because I know your Honor wants me to move on, the bottom line with respect to the equitable nature of the transactional definition here is, is it fair and is judicial economy served by having one or two trials? And I would suggest to the Court that the trial down there, a declaratory action, a bench trial, with only a couple of witnesses, three depositions, is entirely different and separate from the trial that was scheduled to appear with 30 depositions, many witnesses, and a completely different issue. If the two trials had been put together, it wasn't going to save anybody any time, and if we had filed this case down there, they would have to do separate work because it's the nature of the advice that's been rendered that's key. They would have to do the same work down there as they did here. It's not a situation where the parties were so identical that if I defend one, I defend the other. Ms. Rethsek, what I want to know is what evidence of fraud have the Athertons uncovered since the Pulaski County trial that was not available prior to the suits in Pulaski's conclusion? I know the Court doesn't like me to not answer directly, but I'd say first of all, my first answer to that is it doesn't matter. If we could have, the question here is did we have to sue them there? And that's a different question. The argument is that, as I read your brief, was that you had uncovered these issues of consumer fraud at the time of the Pulaski case, that it went from the beginning to the end in a matter of seven months, that your clients were working in good faith and they trusted and relied on the defendants and so there wasn't any reason for them to suspect fraud at the time. But my question is was not there that consumer fraud present at the time of the Pulaski County suit and therefore should you not have pled that in the initial suit? And if not, then what, to my original question, then what evidence of fraud have the Athertons uncovered subsequent to the Pulaski County suit that gives rise to the belief that it should not have been included in the original consumer fraud? I mean the original Pulaski County suit. Obviously the fraud existed before the Pulaski County suit, but the record shows that the Athertons became suspicious during the course of this seven months of litigation down there because depositions were being taken and the record reflects that they had some thoughts about it. But the nature of the fraud, that they were going to be able to prove it, really occurred or came into evidence when they were able to take Dr. Post, Dr. York, and Dr. Oprich's depositions at length on the issues up here. And the court may recall, for example, in Dr. York's deposition at page 111, it came out that a lawyer, that some of the decisions that were being made to reduce hours were being based upon a lawyer's statement, a lawyer's advice to the doctors. That's in page 111 of Dr. York's. Those questions, those issues weren't relevant in the lawsuit down there. As a matter of fact, if they had come into court in Pulaski County and said, Judge, we want to add a fraud count against the people who advised the defendants here, that judge wouldn't have let them do that because he would say it's not the same case. I have a bench trial that I'm supposed to get done in months because the medical care that this girl needs to stay alive and well is that issue. This is a separate case. There's no doubt from the file that the Athertons became suspicious about the reasons for it, but they really didn't know the reasons for it until they got counsel, separate counsel to take care of this case and pursued it and got to take these depositions at length. That's the best answer I can give you. I go back to the fact that you can file a lawsuit doesn't mean that you have to. That's not part of res judicata. Res judicata looks to see you have to if it's the same transaction and the parties are in interest. And I would respectfully say that did not occur here. Okay, but the res judicata language is a suit that could have been brought at the same time. So I guess my question would be, and it appears that you are acknowledging that the fraud allegations or the suit existed at the time of the last case. It had to because the decision was made before quality care cut the hours, and they were talking about cutting the hours there. Okay, so is it the fact that the claim existed or there seems to be some language in case law that it's whether or not the plaintiffs knew of the claims exercising due diligence. The defendants themselves seem to say that there was a window between February and April of 06 where discovery was given to the plaintiffs that could have given them an awareness of this fraud. The fraud here being not the decision that these doctors made, but the reason that they made the decision. There's no doubt that they made, there's no doubt that we disagree that they made the decision. The fact that the doctors made the decision for grounds unrelated to medical analysis or medical opinions is what the plaintiffs didn't know, and there is nothing in this record that clearly showed that to them until, basically until they had lawyers look at it for that specific purpose. And that process began obviously during that trial, during that six or seven month window downstate. So that they were unhappy with the decision, but the fact that the doctors and nurse, doctors, two doctors, Post and Ober, and the nurse made the decision we've alleged fraudulently, and that's the case that would go to trial here, is something they didn't know during that time period. They might have been suspicious, but they didn't know. They actually filed this lawsuit, and I agree, the injunctive trial came to a conclusion in June, and there was a delay in entering the order and this lawsuit was filed in between. But that should not be, what this court would have to request, require them to do as soon as they were in any way suspicious and began to talk to lawyers, is expedite everything to get this ready to go to Pulaski County and make the decision and ask that judge to make this part of that case. And I still submit if they've done that. I will say time is expiring. Thank you. Actually, we'll rest on a brief for the remainder of our argument. Thank you. Good morning, Your Honors. My name is Steve Swofford on behalf of all the defendants. This dispute here in this fraud case clearly arose out of the same group of operative facts, and that's why we say the transactional test of race to the counter bar is the suit. Both suits ultimately turn on were the benefit decisions made here wrong or right. I mean, that is the crux of the suit, and the only difference between the two suits is the motivation for those decisions. In this case, unlike the prior case, the plaintiffs are claiming that there was some fraudulent motivation. And I can almost stop there since they arose out of the same facts and say that the transactional test should apply here. But there's a lot more to this case. There's really no question that they could have brought this fraud claim in Pulaski County. They started the case in December of 2005. They took discovery. They deposed Nurse York and Dr. Ober, which they have redeposed in this case. They put the nurse and the doctor on the stand in their case in Pulaski County. They obtained all the documents that they're relying on now in the Pulaski County case. Significantly, one of the things that triggered, I suppose, their fraud claim, that the decisions made by the defendants were not based on medical facts but rather on something else, was some medical notes or records from Intracorp where it showed that Attorney Lindstrom from Connecticut General had participated in a benefit decision. And there were some things crossed out, not by Connecticut General, by the way, but by the Attorney General's office on the basis of attorney-client privilege. And if you get into the facts of these cases, you're going to find that all that Attorney Lindstrom said was, there's appeals pending here. Let's keep the benefits the same. But that triggered the fact that there were these excisions and there was an attorney involved triggered this fraud claim. And that's why in the record there's a letter in early March where the Attorney Goodman from the Pulaski County case contacted Attorney Horne to consult with him about whether there's a direct action against Connecticut General. And at that time, Plaintiff's New Counsel in this case said they would consider direct action. And if you look into the record, there's even a statement in the summary judgment papers where the plaintiffs have admitted that by the end of discovery in the Pulaski County case that they discovered the fraud. And the discovery in the Pulaski County case ended in March or April of 2006. That was two months before that case was tried. It's just, it wouldn't have been burdensome. And it's not at all uncommon for plaintiffs to join injunctive claims like they had in Pulaski County with a monetary claim like they're bringing here. And there was just no reason at all, two months before trial, three months before judgment, for the plaintiffs not to bring that fraud claim in the Pulaski County case. They made a conscious decision to split their claims. Under the Civil Practice Act, they were free to amend their complaint at any time before the Pulaski County judgment. The Pulaski County judgment was in July of 2006. And when was this case filed in Cook County? In June of 2006. So they already filed their fraud claim before they even had a judgment in Pulaski County. So I don't know why they chose to split their claims, but they did make that conscious decision to do so. They have argued there was some sort of emergency situation in Pulaski County and that's why they split their claims. But that's not an excuse for splitting their claims. I mean, they filed in Pulaski County. They got a TRO. They got a quick hearing on injunction. They still could have gotten a quick hearing on injunction. A preliminary injunction and then gone ahead with their monetary damage claim. That's common practice for, as I'm sure you know, that parties do that all the time. With regard to privity, what Mike said was a little bit inaccurate. There's no question that Intercorp and Connecticut General were agents they had contracts with and they were agents of the state plan. Intercorp's job was to make medical type evaluations. Connecticut General's job then was, among other things, was to make the ultimate benefit, or you shouldn't say the ultimate, but the benefit decision. The plan wasn't really making any benefit decisions at all, except through Connecticut General based on Intercorp's medical evaluations. Now, ultimately the plan would decide a case if, after the benefits were reduced as here, if the plaintiffs had taken, they took two appeals. The first two appeals were through Connecticut General. They were both denied. They had two further rights of appeal available to them, which would have gone to the state. So in that sense, the state plan would have been the ultimate decider. But as far as the decisions were made here, they were made by Connecticut General, acting as agents of the state. And I don't know that you have a clear case of privity, in addition to the fact that the state defended the decisions my clients made all the way through a trial, all the way through appeal in Pulaski County. They had totally common interests. So I don't think there's any question about privity unless you have any questions. I would like to say something about the fraud part of this case. There are two reasons why we don't believe there's a cause of action for fraud. One is the lack of reliance by the plaintiffs on any decision. Your opponent has stated that's because you can file a suit doesn't mean that you have to. How would you differ with that? Well, I would say that River Park and a bunch of other cases have applied the transactional test and made it such a point of saying that that judicial economy requires us to, that it wasn't – there's no doubt in my mind, I don't know that – there was no reason for them not to do it. The law required it. If you take what my grant stack said to its conclusion, it kind of wipes out the entire claims funding prohibition unless I'm missing something in your question. Anyway, I would briefly like to talk about the fraud, if you will. The trial court rule entered summary judgment on the fraud claim because of a lack of reasonable reliance because the plaintiffs disagreed with every benefit decision my clients made. They protested every benefit decision my clients made. They testified that they always believed that Brooke needed the medical care that she wasn't getting because the state was reducing benefits. When the benefits were reduced, they took money out of their own pockets and they paid for additional nursing care. So if they didn't believe the nursing was necessary, why would they pay for it? They just simply never believed anything my clients said and they also testified on several occasions that they relied solely on Brooke's treating physician and her nurses for what care Brooke needed. So as a matter of fact, I don't think they relied at all. But even if there was a question on that, if you look at cases like Doe versus Dilling, the law is that reliance is unreasonable if the plaintiff even doubts the truth of representations or if other information is available to them. And clearly here, where they protested every reduction in benefits, they were certainly doubting anything that we said. But beyond that, and this is something that the trial court really didn't get into and actually the trial court didn't accept, is there's a failure here to distinguish between the representations and the actual benefit decisions. There's nothing in this case that shows that the representations had anything to do with the reduction in benefits. The reduction in benefit decisions were made.  And whether they relied on it or not, it didn't make any difference. It just didn't make any difference. The benefits were reduced and you really have to separate the reductions from all these letters that the explanation of benefit letters on which the plaintiffs relied for so-called misrepresentations. They will sustain the same damage regardless of those letters because the benefits were simply reduced. And proximate cause is important here. I wanted to make a point of that because it also bears on the consumer fraud action where proximate cause is the defense. And the trial court didn't get to that. The trial court held with regard to the Consumer Fraud Act claim that reliance wasn't an element of the cause of action for consumer fraud and therefore didn't rule in our favor on that aspect of the case. We do submit, however, that deception is a required element of consumer fraud. And if the plaintiffs were not in fact deceived by these representations, which I think the evidence shows since they in fact did not rely, we should have been entitled to summary judgment on the Consumer Fraud Act claim on that basis as well. I'm not unsympathetic to the argument that it's rather illogical to suggest that there's a proximate cause between a misrepresentation and damages if there is no reliance. It doesn't make a lot of sense to me, but we're not the ones that invented that rule. That got invented upstairs. So now the question becomes what difference is there between deception and reliance? If you're not deceived, if you don't rely, how can you be deceived? To be deceived, you have to rely. So it's one half of the other. Well, there's a little bit. Well, maybe I'm not understanding your question. I didn't mean to cut you off. Go ahead. I think what the trial court was getting at was that reasonable reliance is not an element of a Consumer Fraud Act claim, and reliance isn't at all. But when you get to actual reliance, where the plaintiff actually relies, that involves deception. In other words, I tell a lie, and you don't believe me at all. You're not deceived. If I tell you a lie and you scratch your head, that wouldn't be that. If you tell me a lie and I don't believe you, how can there be a proximate cause between your telling me the lie and the damages that I suffer? There can't be. There can't be. No. Well, the Supreme Court says there can be, because you don't need reliance. So I'm lost on the proximate cause. I can't figure this out. It doesn't make a lot of sense to me, but I'm just, you know, down here. Well, I think you're ahead of me because you're confusing me. Well, the court does say there has to be deception, correct? I mean, I'm not asking questions. I'm just rhetorical. Well, yeah, you have to misrepresent with an intention that there be reliance. That's what they say the elements are. But the fact of the matter is, if there is no reliance, how can there be a proximate causal relationship? Well, there can't be. Well, you've got to tell that to them upstairs. They don't seem to understand. Well, they do say actual deception is required in several other cases. So, I mean, I'm not asking you questions. You're putting words in your mouth. So, I mean, it's like this is becoming sort of a semantic game. I hope I don't have to tell this to them upstairs. Anyway, I guess I'd just like to make a couple of comments in conclusion. You know, the plaintiff's here just trying to take a contract action that was already tried in Pulaski County and rebring it all dressed up as a fraud action against parties who made all the benefit decisions on behalf of the state that were before the court in Pulaski County. My clients made all these benefit decisions without any economic benefits in themselves whatsoever. They weren't compensated extra for denying claims, and that's clear in the record. It's kind of hard to go through the piece out here, but it's in the briefs. And, you know, the Pulaski County case ultimately held, this is kind of a fact lost, it's in the briefs, but I didn't argue it, that all those benefit decisions were neither unreasonable or vexatious under the insurance code. And I just respectfully urge the court to, for all these reasons, to affirm the judgment of the trial court. Thank you, counsel. Thank you. Brief rebuttal. Thank you. What I was waiting for and what I knew I could not hear was how the judgment in Pulaski County affected York, Ober, Intercorp, and Cigna, and Connecticut General. It does not. And Permal, which is a case that they relied upon, that all the defendants relied upon here, is that when you're looking to see if there's privity between the party we sued down here and the party we sued up here, you look to see if the person who was not a party in Pulaski, and that's the defendants here, were affected by the judgment as if they were a party in Pulaski County. They are not. As said before, and counsel did not disabuse that court of point that was wrong. If they're not affected by it, they're not necessary parties because they, in fact, are not in privity. And once they're not in privity, race judicata falls. If we could have filed another lawsuit down there at the same time, possibly. But I'd ask the court to keep in mind, if we tried to do what counsel just, what Mr. Swafford just suggested to you, we would have had to go to that court and not amend the complaint. We would have had to add new parties because the interest, and that proves my point, the interest that we had down there against quality care are not the interests we were talking about here. On the one side is the decision for hourly, the decision whether or not care was medically necessary. On the other side is lying as part of the input into that decision process. We took care of that, and up here we're taking care of this. Unless the court has some further questions, I realize my time is up. Thank you, counsel. Thank you. This matter will be taken under advisement.